IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

BLACKTAIL INVESTMENTS LLC,

    Plaintiff,

v.                                        Case No. 3:25-cv-383

ON-SITE CONCRETE SOLUTIONS, LLC,

    Defendant.

## COMPLAINT

Plaintiff Blacktail Investments LLC, by and through its attorneys, for its Complaint against Defendant On-Site Concrete Solutions, LLC, hereby alleges as follows:

### INTRODUCTION

1. This lawsuit is a testament to a defendant's greed.

2. On-Site, which holds itself out as a "trusted" partner, specializes in supplying large quantities of bulk materials to domestic buyers.

3. Blacktail, which is a collection of family and friends, was formed for the purpose of pooling resources to invest in mining bulk materials from abroad.

4. In theory, the venture between these two parties made perfect sense: Blacktail would invest the initial capital necessary to mine the materials and prepare them for export to the United States, while On-Site would resell those materials to end users through its connections at home.

5. Blacktail would realize a return on its investment when it sold the materials to On-Site, and On-Site would realize a return on its investment when it resold the materials to an end user.

6. In reality, however, On-Site was not the type of partner that could be trusted. Notwithstanding its agreement to the contrary, On-Site took possession of the materials and refused to pay Blacktail for them.

7. What's more, Blacktail then profited from the materials through a series of sale transactions with an end user *and* retained the aggregate.

8. Yet, On-Site still refused to pay Blacktail.

9. Put simply, Blacktail paid everything and got nothing; On-Site paid nothing and got everything.

10. Blacktail brings this action to right that wrong.

## PARTIES

11. Blacktail is a Delaware limited liability company.

12. Blacktail has three members: (i) Dustin Hawk, a natural person, domiciled in Florida; (ii) Viking Investment Partners LLC; and (iii) SRB Investments LLC.

13. Viking Investment Partners is a Wyoming limited liability company.

14. Viking Investment Partners has two members: (i) RYXYN Holdings LLC; and (ii) Matthew Page, a natural person, domiciled in Florida.

15. RYXYN Holdings is a Wyoming limited liability company.

16. RYXYN Holdings has two members: (i) Justin Hargrove, a natural person, domiciled in Viriginia; and (ii) Kimberly Hargrove, a natural person, domiciled in Viriginia.

17. SRB Investments is a Florida limited liability company.

18. SRB Investments has two members: (i) Charles Keepman, a natural person, domiciled in Florida; and (ii) Ryan Keepman, a natural person, domiciled in Florida.

19. On-Site is a Texas limited liability company.

20. On-Site has two members: (i) Peek Constructors, LLC; and (ii) Dynhesty Port Partners, LLC.

21. Peek Constructors and Dynhesty Port Partners are Texas limited liability companies and all members of Peek Constructors and Dynhesty Port Partners are citizens of Texas. *See* Notice of Removal, E.D. La. Case No. 2:25-cv-00156-DJP-DPC, Dkt. No. 1 at 2.

22. Therefore, Blacktail is a citizen of Florida and Virginia, and On-Site is a citizen of Texas.

## JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction under 28 U.S.C. §1332, as the parties are in complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

24. Personal jurisdiction over On-Site exists at least because On-Site was organized under the laws of the State of Texas and has its principal place of business in Texas. On-Site's principal place of business is located at 2106 Lawrence Road, Kemah, Texas 77565.

25. The exercise of personal jurisdiction over On-Site is consistent with the Due Process Clause of the United States Constitution.

26. Venue is proper under 28 U.S.C. § 1391, because On-Site resides in this district, a substantial part of the events or omissions giving rise to Blacktail's claims occurred in this district, and On-Site is subject to this court's personal jurisdiction.

**FACTUAL ALLEGATIONS**

27. Blacktail is an investment entity formed for the particular purpose of investing in transactions involving bulk materials.

28. On-Site supplies large quantities of bulk materials to buyers.

29. On-Site represents that it leverages "sources through long-term contracts to secure premium aggregates . . . ."

30. One of the contracts On-Site entered into was with Blacktail (the "Pay-Upon-Loading Agreement").

31. Pursuant to the Pay-Upon-Loading Agreement, Blacktail agreed to invest—and did invest—the capital necessary to purchase limestone aggregate to be mined in Jamaica.

32. For its part, On-Site agreed to pay Blacktail for the aggregate so that On-Site could sell it at a mark-up through one of its connections to third-party purchasers.

33. On-Site agreed to pay Blacktail $46.00 per metric ton of aggregate mined, to be paid once a carrier vessel was loaded with the material in Jamaica for export to the United States.

34. The parties' agreement was evidenced by, among other things, email correspondence.

35. On April 26, 2024, Blacktail wrote to On-Site, memorializing the parties' prior discussion and proposing a payment term: "As discussed $46mt per load paid by Onsite once Vessel [*sic*] is loaded."

36. That same day, On-Site responded, indicating its acceptance and assent, and the Jamaican limestone transaction moved forward.

37. Prior to leaving Jamaica, the limestone aggregate was tested by an independent laboratory.

38. This test was successful in that it showed the aggregate met the applicable specifications.

39. Approximately 40,085 metric tons of limestone aggregate were loaded onto a vessel in Jamaica.

40. At this point, pursuant to the Pay-Upon-Loading Agreement, On-Site was obligated to pay Blacktail approximately $1,843,910.00.

41. However, without justification, On-Site failed to satisfy its obligation to pay Blacktail.

42. Worse yet, after the vessel carrying the aggregate left Jamaica and arrived at a property leased by On-Site in the United States, On-Site, having taken possession of the aggregate, sold the aggregate to Vulcan Materials Company ("Vulcan").

43. On-Site did not consult Blacktail on the price at which On-Site intended to sell the aggregate to Vulcan.

44. Nonetheless, having received payment for the aggregate from Vulcan, On-Site still did not pay Blacktail.

45. Worse *still*, after the job fell through for which Vulcan had intended to use the aggregate, Vulcan sold the aggregate back to On-Site at a price less than the sale from On-Site to Vulcan.

46. Vulcan sent the aggregate back to On-Site, where it remains in On-Site's possession.

47. On-Site, however, did not pay Vulcan for the sale of the aggregate back to On-Site.

48. In sum, despite (i) an obligation to pay for aggregate upon loading; (ii) receipt of payment from a third party for aggregate for which it had not paid; and (iii) physical possession of

aggregate for which it had not paid, On-Site has, to date, refused to pay Blacktail for the aggregate for which Blacktail *has* paid.

## COUNT I
### (BREACH OF CONTRACT)

49. Blacktail realleges and incorporates by reference the above paragraphs of the Complaint as applicable.

50. Under the terms of the Pay-Upon-Loading Agreement, itself a valid and enforceable contract, Blacktail agreed to invest—and did invest—the capital necessary to purchase limestone aggregate sourced from a mine in Jamaica.

51. For its part, On-Site agreed to pay Blacktail $46.00 per metric ton of aggregate once a vessel was loaded with the material in Jamaica for export to the United States.

52. On-Site breached the parties' agreement by refusing to pay Blacktail for the aggregate.

53. As a result of On-Site's breach, Blacktail has suffered actual and significant damages in the amount of $1,843,910.00.

## COUNT II
### (BREACH OF CONTRACT)

54. Blacktail realleges and incorporates by reference the above paragraphs of the Complaint as applicable.

55. Prior to the filing of this lawsuit, in response to Blacktail's demand, On-Site acknowledged an agreement between the parties.

56. However, according to On-Site, under the parties' agreement, payment by On-Site was not due to Blacktail upon loading.

57. Rather, according to On-Site, the parties agreed that payment by On-Site was due to Blacktail upon On-Site's resale of the aggregate to a third-party (the "Pay-Upon-Resale Agreement").

58. Further, according to On-Site, the payment amount due from On-Site to Blacktail was the third-party purchase price, less On-Site's costs.

59. Therefore, Blacktail alleges in the alternative to Count I that it is entitled to recover for breach of the Pay-Upon-Resale Agreement if it is determined that either a valid and enforceable Pay-Upon-Loading Agreement does not exist, that the Pay-Upon-Loading Agreement does not cover the subject matter of the dispute between the parties, or the Pay-Upon-Loading Agreement is void, invalid, or unenforceable.

60. Under the terms of the Pay-Upon-Resale Agreement, itself a valid and enforceable contract, Blacktail agreed to invest—and did invest—the capital necessary to purchase limestone aggregate sourced from a mine in Jamaica.

61. For its part, On-Site agreed to pay Blacktail upon resale of the aggregate by On-Site to a third-party in the amount of the third-party purchase price, less On-Site's costs.

62. On-Site breached the parties' agreement by failing to pay Blacktail upon resale of the aggregate by On-Site to Vulcan.

63. As a result of On-Site's breach, Blacktail has suffered actual and significant damages in the amount to be proven at trial.

## COUNT III
### (UNJUST ENRICHMENT)

64. Blacktail realleges and incorporates by reference the foregoing paragraphs of the Complaint as applicable.

65. Blacktail alleges in the alternative to its breach of contract claims that it is entitled to recover under the doctrine of unjust enrichment if it is determined that either a valid and enforceable contract does not exist, the existing contract does not cover the subject matter of the dispute between the parties, or the existing contract is void, invalid, or unenforceable.

66. Blacktail, at its expense, and by and through its investment of the necessary capital to have the Jamaican quarry mine and load the aggregate onto a vessel for On-Site, provided On-Site with approximately 40,085 metric tons of limestone aggregate.

67. The aggregate has value as it can be resold by On-Site through one of its connections to third-party purchasers.

68. On-Site was enriched by virtue of Blacktail providing On-Site with the aggregate, because On-Site obtained valuable materials that it could resell to a third-party purchaser.

69. On-Site was enriched with a monetary benefit when it was paid by Vulcan for the aggregate and/or when it repurchased the aggregate from Vulcan at a lower price.

70. Blacktail allowed On-Site to take possession of the aggregate based upon the expectation that On-Site was a trusted partner and would compensate Blacktail for the aggregate.

71. The parties had previously discussed compensation of Blacktail by On-Site, and On-Site represented to Blacktail that it would compensate Blacktail for the aggregate.

72. Further, as a matter of common sense, On-Site knew that Blacktail, an investment entity, would not voluntarily relinquish control of a valuable material without an expectation of compensation for it.

73. On-Site knew of and utilized Blacktail's expectation to obtain the aggregate; however, once On-Site had obtained the aggregate, it refused to compensate Blacktail.

74. On-Site wrongfully secured the aggregate through fraud, duress, undue advantage, and/or passively received and retained the aggregate and/or the proceeds of its resale and repurchase transactions.

75. For the reasons set out above, On-Site has been unjustly enriched and it would be unjust and/or unconscionable to permit On-Site to retain the aggregate and/or proceeds without compensating Blacktail.

76. As a result of On-Site's conduct directly resulting in On-Site's retention of the aforementioned benefits and unjust enrichment, Blacktail has suffered actual and significant damages, including, without limitation, the loss of the aggregate and the return on its investment in the Jamaican aggregate transaction.

77. On-Site will be unjustly enriched if allowed to retain the aforementioned benefits and, therefore, Blacktail is entitled to full restitution of the value of the benefits conferred in an amount to be determined at trial.

## COUNT IV
### (QUANTUM MERUIT)

78. Blacktail realleges and incorporates by reference the foregoing paragraphs of the Complaint as applicable.

79. Blacktail alleges in the alternative to its breach of contract claims that it is entitled to recover in quantum meruit if it is determined that either a valid and enforceable contract does not exist, or the existing contract is void, invalid, or unenforceable.

80. Blacktail, at its expense, and by and through its investment of the necessary capital, provided On-Site with approximately 40,085 metric tons of limestone aggregate.

81. The aggregate is valuable as it can be resold by On-Site for a profit through one of its connections to third-party purchasers.

82. The materials that Blacktail provided to On-Site were intended and undertaken for On-Site, and On-Site benefitted from those materials. Blacktail purchased the limestone aggregate from the Jamaican mine with the intent that On-Site, specifically, would ultimately take possession of it in exchange for compensation.

83. On-Site accepted the materials that Blacktail provided and took possession of the materials after they were loaded onto the vessel for export.

84. On-Site used and enjoyed these materials—including, without limitation, through its resale transactions with Vulcan.

85. Blacktail expected to be compensated for the materials provided, and On-Site had reasonable notice that Blacktail expected to be compensated for the materials provided.

86. The parties had previously discussed compensation of Blacktail by On-Site, and On-Site represented to Blacktail that it would compensate Blacktail for the aggregate.

87. Further, as a matter of common sense, On-Site knew that Blacktail, an investment entity, would not voluntarily relinquish its control of a valuable material without an expectation of compensation for it.

88. As a result of On-Site's refusal to pay Blacktail for the reasonable value of the materials provided, Blacktail has suffered actual and significant damages, in an amount to be determined at trial, including, without limitation, the reasonable value of the materials provided.

WHEREFORE, Blacktail requests an order and judgment against On-Site as follows:

A. Awarding Blacktail an amount of compensatory and restitution damages to be determined at trial, as well as indirect, consequential, and punitive damages;

B. Awarding Blacktail its expenses, costs, disbursements, attorneys' fees, and all applicable pre-judgment and post-judgment interest; and

C. Awarding Blacktail such other relief as the Court deems just and proper.

## JURY DEMAND

Blacktail demands a trial by jury on all issues, claims, and defenses in this action so triable.

Dated this 25th day of November, 2025.      Respectfully submitted,

*/s/ Andrew Bean*
Andrew Bean
S.D. Tex. No. 3945223
Texas State Bar No. 24097352
HILGERS PLLC
8750 N. Central Expressway, Suite 750
Dallas, TX 75231
Email: abean@hilgerslaw.com
Telephone: 469-689-8844
Facsimile: 402-413-1880

Matthew M. Wuest
  (*pro hac vice* application forthcoming)
Wisconsin State Bar No. 1079834
Kameron M. Dix
  (*pro hac vice* application forthcoming)
Wisconsin State Bar No. 1139985
GODFREY & KAHN, S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
Phone:  414-273-3500
Fax:  414-273-5198
Email:  Mwuest@gklaw.com

*Attorneys for Plaintiff Blacktail Investments LLC*